**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GELASIA CROOM, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | Judge |
| v. | ) | |
| | ) | Magistrate Judge |
| PREVENT CHILD ABUSE AMERICA, | ) | |
| | ) | Jury Trial Demanded |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, Gelasia Croom, by and through her attorneys, Pedersen & Weinstein LLP, for her Complaint against Defendant, Prevent Child Abuse America, states as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this action to challenge Defendant's unlawful discrimination against her based on her race, as well as the retaliation she suffered as a result of opposing the unlawful conduct.  Plaintiff asserts her claims under the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, ("Title VII") and 42 U.S.C. Section 1981 ("Section 1981"), as well as the Illinois Human Rights Act ("IHRA").

## JURISDICTION AND VENUE

2.     Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343, and principles of pendent and supplemental jurisdiction.

3.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a).

## PARTIES

4.     Plaintiff Gelasia Croom ("Plaintiff") was formerly employed by Defendant as its

1

Chief Communications Officer in Chicago, Illinois. Plaintiff began her employment in April 2022 and was unlawfully fired in March 2024. Plaintiff's race is black.

5.     Defendant Prevent Child Abuse America ("Defendant") holds itself out as the nation's oldest and largest organization committed to preventing child abuse and neglect. Headquartered in Chicago, Illinois, Defendant maintains chapters in all 50 states.

6.     At all times relevant to this Complaint, Defendant employed more than 15 employees and was engaged in an industry affecting commerce.

## FACTUAL ALLEGATIONS

*Plaintiff's Employment With Defendant*

7.     Plaintiff was hired by Defendant to be its Chief Communications Officer, although she was inexplicably demoted to Senior Director of Communications in early 2024.

8.     Throughout her employment, Plaintiff's job duties included managing Defendant's integrated marketing and communications initiatives, creating content, overseeing media relations, acting as communications liaison to key internal and external audiences, and managing outside vendors, among other tasks.

9.     Plaintiff enjoyed her job and performed it extremely well, as evidenced by the various projects she successfully completed, the favorable performance reviews she earned (she consistently was rated as meets or exceeds expectations), and the positive feedback she received from colleagues, board members and management. To be sure, over her tenure – and despite Defendant's recently contrived claim that it fired Plaintiff for poor performance –she received the following accolades, among others, from her direct supervisor:

> "[Plaintiff] does a great job paying attention to details considering all the tasks and products she has to juggle."

> "[Plaintiff] does a good job with staying organized and completing her work on time."

2

"[Plaintiff] does a great job offering her advice and guidance across the organization."

"[Plaintiff] has done an excellent job leveraging and elevating our social media presence and folks have commented on how much is coming out and the quality of the content."

"[Plaintiff] is great at receiving feedback from her supervisor and putting it to action."

"[Plaintiff] is a great addition to our team."

10.    Plaintiff was also rated as "Exceeds Performance Expectations" on her most recent annual review, issued just three months before her termination.

11.    In short, by Defendant's own standards, Plaintiff was an exemplary employee.

12.    Based on her background, qualifications and passion for her job, Plaintiff had every reason to anticipate a long and successful career with Defendant.

***Defendant Discriminated Against Plaintiff On Account Of Her Race***

13.    Despite her exemplary job performance and dedication to Defendant and its mission, Defendant treated Plaintiff poorly as compared to her white colleagues and ultimately pushed her out of the organization as a result.

14.    As an initial matter, it is clear that Defendant has a preference for white and/or non-black employees, as evidenced by the relatively few black employees who work for the organization, particularly in high-level positions.  Indeed, throughout her employment, Plaintiff was the only black employee on Defendant's executive leadership team.

15.    Moreover, Plaintiff is aware of other employees who experienced racial discrimination like she did, including one who lodged a formal complaint against the same person Plaintiff did before she (Plaintiff) was fired.  Defendant did nothing to remedy the discrimination or to prevent it from happening to Plaintiff.

16.    Consistent with this pattern of discrimination, Defendant took several adverse actions against Plaintiff because of her race.  Examples of Defendant's unlawful treatment of

3

Plaintiff include, but are not limited to, the following:

a)    Defendant denied Plaintiff the level of support appropriate to her position and that the other, all white executive team members received. For example, Plaintiff's immediate supervisor was on vacation for almost an entire month following Plaintiff's hire, effectively leaving Plaintiff with no managerial support during this critical time. For further example, until late 2022, Plaintiff was the only member of the executive team with no staff, forcing her to perform an unwarranted amount of work, including work that should have been done by lower-level employees. Although Plaintiff still performed her job well, she did so under incredible pressure and sacrificed spending time with her family in the evenings and on weekends to do so.

b)    When Plaintiff was finally allowed to bring on a staff member in December 2022, she hired Irmes Dagba. Ms. Dagba is also black and over time, Plaintiff detected hostility from other employees directed at both her and Ms. Dagba. This aggression came through in the form of harsh emails to her and Ms. Dagba, criticisms for trivial or nonexistent matters, and an overall tone of palpable disrespect.

c)    Plaintiff was marginalized within the organization and consistently made to feel less important than her white counterparts. For example, at a dinner meeting in October 2023, Plaintiff was repeatedly interrupted by President and Chief Executive Officer Melissa Merrick ("Merrick") and Jennifer Jones ("Jones"), Chief Strategy Officer and Plaintiff's direct supervisor. The treatment was so obvious that other attendees noticed it, too.

d)    Plaintiff and other black employees were subjected to highly offensive racial comments at a work-related event. More specifically, at a conference in Baltimore in September 2023, Defendant brought in an expert on racial relations to discuss the issue of race and racism with Defendant's workforce. During this discussion, a white employee of Defendant made a comment in the presence of all attendees that "even slaves had a choice," or words to that effect, implying that black people are responsible for the adverse treatment they receive. Shortly thereafter, Plaintiff publicly protested the discriminatory remarks and said they should not have happened.

e)    In January 2024, shortly after opposing the offensive and discriminatory treatment described above, Defendant demoted Plaintiff and abruptly changed her title from Chief Communications Officer to Senior Director of Communications. The title change was announced at a meeting for the entire executive team and Plaintiff was given no advance notice of the demotion. Plaintiff was also the only employee within the organization

whose title was downgraded. Stunned, she later asked Merrick and Jones why Defendant had done this, expressing that it was disorienting, embarrassing and incredibly hurtful both personally and professionally, and also seemed inconsistent with Defendant's purported commitment to representation. The decision otherwise made no sense because Plaintiff's job duties did not change (indeed the job descriptions are virtually identical) and it appeared to her that the decision was intended only to embarrass and humiliate her. She asked Defendant to reconsider the decision and even offered an alternative title that would help preserve her standing and professional image. Plaintiff did not receive any meaningful response or explanation.

f)  After demoting and demoralizing Plaintiff with the discriminatory title change, Defendant then chastised Plaintiff for being upset about it. Indeed, Jones reprimanded Plaintiff for her demeanor at a meeting the very next day. Similarly, Merrick criticized Plaintiff's demeanor at a later time, telling Plaintiff that she noticed she was not as "jovial" as she used to be or smiling like she had before and that it was "unprofessional." The irony of being reprimanded for being unhappy about a discriminatory demotion, as well as the stereotypes invoked by telling a black woman that she should smile more and not look angry or upset, was not lost on Plaintiff.

g)  At a special event sponsored by the NBA in Indianapolis in late February 2024, an event to which Plaintiff was critical in securing invitations for Defendant to attend for the first time in its history, she and Ms. Dagba were treated like second-class citizens. Apart from having to transport all materials for the conference to Indianapolis and then keep Merrick company until late in the evening (at Merrick's request and while Merrick drank to excess), they were then tasked with getting coffee for Merrick and Kelly Christopher ("Christopher"), Chief Development Officer, the next morning. Although Plaintiff politely tried to decline, explaining that getting coffee would likely make her and Ms. Dagba late for the conference, they were asked to do it anyway.

h)  Two weeks after the Indianapolis event, Jones – who had not attended – told Plaintiff that she wanted to "save some time to talk about Indy" with her during their regular 1 on 1 meeting. Plaintiff expected to be commended for how well the NBA event had gone, but was shocked when Jones instead reprimanded her, telling Plaintiff that "I heard you missed the meeting on Friday" and "I heard you were late on Saturday morning," or words to that effect. Plaintiff was stunned and asked Jones where she was getting that information because it was not accurate. Plaintiff also asked Jones if she (Jones) was aware that Plaintiff was only ever tentatively scheduled to attend the meeting on Friday because she had to drive up with all the equipment and during a snowstorm no less and that

the reason she was late on Saturday morning was because she had to get coffee for Merrick and Christopher as though she was their personal assistant. Jones indicated she was not aware of these details. Plaintiff became even more demoralized as it was obvious to her that Merrick and Christopher were unjustly disparaging her to her direct supervisor.

i) Around the time of the Indianapolis event, Christopher's antagonistic attitude toward Plaintiff began to escalate. Apart from ignoring Plaintiff at the NBA event (Christopher conspicuously had introduced her family who had attended the event with her to other employees of Defendant but not to Plaintiff or Ms. Dagba), Christopher thereafter inexplicably began supervising Plaintiff's work while also treating her with abject hostility. For example, in an email exchange on March 20, 2024, Christopher ignored Plaintiff's guidance on how a particular page should look on the organization's website and was rude and dismissive toward her. Jones was copied on Christopher's abrasive emails to Plaintiff, but did nothing to intervene.

17. The cumulative effect of these events was that Plaintiff was forced to work in a hostile environment.

**Plaintiff Reported The Discrimination,**
**But Defendant Failed To Take Appropriate Remedial Action**

18. Plaintiff did her best to work in the unwelcoming environment, but by late March 2024, the situation had become untenable. Accordingly, on March 21, 2024, Plaintiff sent Jones an email about the hostile and toxic environment she found herself in and spoke further with Jones about her concerns later the same day.

19. In that meeting on March 21, 2024, Plaintiff told Jones that as a black woman, Christopher's behavior towards her was troubling. She also told Jones that she (Plaintiff) felt the same way the other black employee who had made a complaint of race discrimination against Christopher felt: that Christopher treated her with disrespect and that Christopher seemed to have a problem working with black employees. Four days later, Plaintiff was fired.

**Defendant Retaliated Against Plaintiff For Opposing And Reporting Race Discrimination**

20. Plaintiff had hoped that Defendant would take appropriate remedial action in

response to her report of race discrimination, but it did not.  Instead, Defendant took swift

retaliatory action against her.

21.     To be sure, on March 25, 2024, four days after her complaint to Jones about race

discrimination and a few months after her earlier complaints, Plaintiff was called into a meeting

and abruptly fired.  Jones told Plaintiff that "things are just not working out" and "since the title

change, it seems like you have been a little off," or words to that effect.  Merrick also told

Plaintiff that "it's just not a good fit," or words to that effect.  Given that Plaintiff had received

no warning, disciplinary notice, or performance improvement plan whatsoever, and in fact had

recently been rated as *exceeding* her performance expectations, Plaintiff understood immediately

that she was no longer a "good fit" because of her race and because she had just complained

about race discrimination.

22.     Plaintiff understands that Defendant is now claiming that it fired her for poor

performance but this is pure pretext.  As noted above, Plaintiff never received any indication that

her performance was unsatisfactory or that her job was in jeopardy.  Quite to the contrary, she

consistently received positive feedback on her performance and had just been rated as "Exceeds

Performance Expectations" on her most recent review.

23.     Recognizing that the timing alone of its actions gives rise to an inference of

retaliation, Defendant is also now claiming – conveniently – that it actually had made the

decision to fire Plaintiff by March 14, 2024, before her most recent complaint of discrimination.

Defendant claims it only waited to inform Plaintiff of her termination on March 25, 2024 until

Jones could be present at the termination meeting.  This, too, is plainly pretextual; no

documentation exists to support this self-serving claim and it otherwise defies logic because

Jones was in the office between March 14 and March 25, 2024.  Indeed, Jones had been in

Chicago for two days (March 22 and 23, 2024) for the board meeting. Jones then left Chicago to drive back to her home in Wisconsin, but drove back again on March 25 to fire Plaintiff.

24.     In light of all the circumstances, including Defendant's obvious preference for white employees, its failure to appropriately address prior complaints of race discrimination (including against the same person who discriminated against Plaintiff), the hostility and demeaning treatment Plaintiff experienced throughout her employment, the pretextual explanation for her termination (which is tantamount to an admission of retaliatory intent), and the timing of her termination (on the heels of reporting race discrimination), there is no question that Defendant fired Plaintiff because of her race and because she had opposed its discriminatory conduct.

***Defendant Failed To Exercise Reasonable Care To Prevent And Correct Unlawful Conduct***

25.     Defendant directed, encouraged, and participated in the above-described unlawful conduct. Further, Defendant failed to exercise reasonable care to prevent and correct promptly any harassment or discrimination. Plaintiff did not unreasonably fail to take advantage of any preventive or corrective opportunities provided by Defendant or to avoid harm otherwise.

26.     The discrimination described above was consistent with Defendant's standard operating procedure.

27.     Defendant acted with malice or with reckless indifference to Plaintiff's federally and state protected rights.

***Plaintiff Timely Filed A Charge Of Discrimination***

28.     Plaintiff timely filed a charge of discrimination and retaliation with the EEOC. Plaintiff subsequently received her Notice of Right to Sue on or about November 19, 2024.

29.     The EEOC cross-filed Plaintiff's charge of discrimination with the Illinois

Department of Human Rights ("IDHR") pursuant to the work-sharing agreement between the EEOC and IDHR. After receiving her Notice of Right to Sue from the EEOC, Plaintiff submitted a Notice of Opt Out of IDHR's Investigative and Administrative Process to the IDHR ("Opt Out Notice") so she may pursue her state law claims in court. This Court has supplemental jurisdiction over Plaintiff's claims under the Illinois Human Rights Act pursuant to 28 U.S.C § 1367(a).

***Plaintiff Suffered Damage***

30.     As a direct and proximate result of the unlawful conduct Plaintiff experienced, she has suffered extreme emotional and mental distress.

31.     Plaintiff has lost wages, compensation and benefits as a result of Defendant's unlawful conduct.

32.     Plaintiff's career and reputation have been irreparably damaged as a result of Defendant's unlawful conduct.

33.     Plaintiff suffered embarrassment and humiliation as a result of Defendant's unlawful conduct. Plaintiff suffered loss of enjoyment of life, inconvenience and other non-pecuniary losses as a direct result of Defendant's unlawful conduct, and she has incurred attorneys' fees and costs.

***Punitive Damages / Liquidated Damages***

34.     Defendant acted and/or failed to act with malice or willfulness or reckless indifference to Plaintiff's rights. The conduct alleged herein was willful and wanton and justifies an award of punitive damages and/or liquidated damages.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION OF TITLE VII

35.     Plaintiff realleges paragraphs 1 through 34 and incorporates them by reference as paragraphs 1 through 34 of Count I of this Complaint.

36.     Title VII makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment, on the basis of race.

37.     Title VII also prohibits racial harassment.  Racial harassment that creates an abusive and hostile work environment, such that the conditions of employment are altered, is actionable under Title VII.

38.     By the conduct as alleged herein, Defendant subjected Plaintiff to race discrimination in violation of Title VII.

## COUNT II

### RETALIATION IN VIOLATION OF TITLE VII

39.     Plaintiff realleges paragraphs 1 through 38 and incorporates them by reference as paragraphs 1 through 38 of Count II of this Complaint.

40.     Title VII, specifically 42 U.S.C. Section 2000e-3, makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

41.     Defendant retaliated against Plaintiff for her complaints of discrimination.  By its conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Title VII.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF SECTION 1981

42.     Plaintiff realleges paragraphs 1 through 41 and incorporates them by reference as

paragraphs 1 through 41 of Count III of this Complaint.

43.     42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, ("Section 1981"), prohibits discrimination based on race in the performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.  Section 1981 also prohibits racial harassment.

44.     By the conduct as alleged herein, Defendant subjected Plaintiff to race discrimination in violation of Section 1981.

## COUNT IV

## RETALIATION IN VIOLATION OF SECTION 1981

45.     Plaintiff realleges paragraphs 1 through 44 and incorporates them by reference as paragraphs 1 through 44 of Count IV of this Complaint.

46.     Section 1981, specifically 42 U.S.C. Section 2000e-3, makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

47.     Defendant retaliated against Plaintiff for her complaints of discrimination.  By its conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Section 1981.

## COUNT V

## RACE DISCRIMINATION IN VIOLATION OF THE IHRA

48.     Plaintiff realleges paragraphs 1 through 47 and incorporates them by reference as paragraphs 1 through 47 of Count V of this Complaint.

49.     The Illinois Human Rights Act ("IHRA"), 775 ILCS 5/2-102(A), makes it unlawful to discriminate against any individual in the terms, privileges or conditions of employment on the basis of race.  The IHRA also prohibits racial harassment.

11

50. By the conduct as alleged herein, Defendant subjected Plaintiff to race discrimination in violation of the IHRA.

## COUNT VI

## RETALIATION IN VIOLATION OF IHRA

51. Plaintiff realleges paragraphs 1 through 50 and incorporates them by reference as paragraphs 1 through 50 of Count VI of this Complaint.

52. The IHRA, specifically 775 ILCS 5/6-101(A), makes it unlawful to retaliate against an employee who opposes what she reasonably and in good faith believes to be unlawful discrimination or because she has made a charge, filed a complaint, or participated in an investigation, proceeding, or hearing under the act.

53. Defendant retaliated against Plaintiff for her complaints of discrimination and retaliation. By its conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of the IHRA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court find in her favor and against the Defendant as follows:

a. Declare that the acts and conduct of Defendant violate Title VII, Section 1981, and the IHRA, including the anti-retaliation provisions of those laws;

b. Award Plaintiff the value of all compensation and benefits lost as a result of Defendant's unlawful conduct;

c. Award Plaintiff the value of all compensation and benefits she will lose in the future as a result of Defendant's unlawful conduct;

d. In the alternative to paragraph (c), reinstate Plaintiff with appropriate promotions

and seniority and otherwise make Plaintiff whole;

      e.      Award Plaintiff compensatory damages;

      f.      Award Plaintiff punitive damages;

      g.      Award Plaintiff prejudgment interest;

      h.      Award Plaintiff reasonable attorneys' fees, costs and disbursements; and

      i.      Award Plaintiff such other relief as this Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.


Dated:  February 6, 2025

                        Respectfully submitted,

                        By:

                               */s/Erika Pedersen*
                               Attorney No. 6230020


Erika Pedersen
Jill Weinstein
**PEDERSEN & WEINSTEIN LLP**
231 S. LaSalle Street
Suite 2100
Chicago, IL  60604
(312) 322-0710

13